**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| 6525 Belcrest Road, LLC, | : | Case No. 21-10968 (MEW) |
| | : | |
| Debtor. | : | |

_____:

## <u>DECISION AS TO PROOF OF CLAIM OF DEWEY, L.C.</u>

A P P E A R A N C E S :

LEECH TISHMAN ROBINSON BROG PLLC
*Attorneys for 6525 Belcrest Road, LLC*
New York, New York
  By:  John D'Ercole, Robert Sasloff

WHITEFORD, TAYLOR & PRESTON LLP
*Attorneys for Dewey, L.C.*
Pittsburgh, Pennsylvania and New York, New York
  By:  Scott M. Hare, Kenneth M. Lewis

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

Debtor 6525 Belcrest Road, LLC ("**Belcrest**") used a parking lot owned by Dewey, L.C.

("**Dewey**").  A Ground Lease gave Dewey the right to designate nearby parking garages as

substitute parking spots for Belcrest's use.  Dewey exercised that right, but Belcrest opposed the

substitution.  Belcrest claimed that it owned direct property rights in the Dewey parking lot that

were separate from the Ground Lease; those arguments were rejected by a local Planning Board,

an arbitrator and the Maryland state courts.  Belcrest also argued that the proposed substitution

violated the terms and conditions of the Ground Lease.  An arbitrator ruled against Belcrest on

the Ground Lease issues in a series of three summary judgment orders, the last of which was

issued on May 18, 2021.

Belcrest filed a chapter 11 petition on May 19, 2021 to try to stop the parking substitution from taking effect.  I denied Belcrest's motions for a temporary restraining order and preliminary injunction.  I also granted relief from the automatic stay to permit the arbitration and state court proceedings to continue.  The arbitrator entered a final decision in favor of Dewey in August 2021, and thereafter Belcrest exercised its right to reject the Ground Lease under section 365 of the Bankruptcy Code.

Dewey filed a proof of claim that seeks damages from the rejection of the Ground Lease and that also seeks $23,812.19 of fees and costs that the arbitrator directed Belcrest to pay to Dewey.  Belcrest disputes Dewey's claim.  Belcrest argues that Dewey assigned all rights under the Ground Lease to another party and that Dewey has no standing to file a claim.  Belcrest also argues that Dewey lied to the arbitrator about the arrangements that Dewey had made for the substitute parking, and that Dewey should be estopped or otherwise punished for that conduct. Belcrest also disputes some components of Dewey's rejection damages claim.  Dewey insists that it owns the Landlord's rights to collect rejection damages, that there is no basis for an estoppel, and that Dewey has correctly calculated the amounts of its claim.

The parties stipulated to many of the underlying facts in a Joint Pretrial Order, ECF No. 191, and they stipulated to the admissibility of exhibits during a trial that was held on May 11, 2023.  The parties have also submitted proposed findings of fact and conclusions of law, and they have supplemented the record to include some additional papers that I requested and to address additional points that I raised.

For the reasons set forth below, the Court will allow Dewey's proof of claim in the amount of $2,428,675.83.

## Jurisdiction

The parties agree that I have jurisdiction under sections 157 and 1334 of title 28 of the United States Code and section 502 of the Bankruptcy Code and the power to issue a final determination as to Dewey's claim.

## Findings of Fact

### The Ground Lease

1.      In 1998, Dewey entered into a Ground Lease (the "**Ground Lease**") with an entity that owned the "Metro III" building in Hyattsville, Maryland.  The "Leased Premises" were 7.9 acres of property that was located across the street from the Metro III building.  The tenant under the Ground Lease (the "**Tenant**") had the right to use the Leased Premises "for the parking of vehicles."  The Tenant agreed to pay base rent that would equal a percentage of the Tenant's gross rental income but that could not be less than $690,000 per year.  The Tenant also agreed to pay taxes and utility charges as "Additional Rent."

2.      Section 6.1 of the Ground Lease gave Dewey the right "at any time and from time to time" to designate "Substituted Leased Premises," at which time the "Substituted Leased Premises shall for all purposes of this Ground Lease become the Leased Premises."

3.      Dewey and a successor owner of the Metro III building entered into a First Amendment to the Ground Lease dated July 16, 2014 (the "**Ground Lease Amendment**").  The Ground Lease Amendment introduced the concepts of "Temporary Substituted Leased Premises" and "Permanent Substituted Leased Premises" in place of the term "Substituted Leased Premises."  It also expanded the locations that Dewey was permitted to designate for substitute parking.  The permissible "Permanent Substituted Leased Premises" included two garages

known as Parking Garage A and Parking Garage B, which were not owned by Dewey and which were not located on property owned by Dewey.

4.      At the times relevant to this matter, the Bernstein Companies ("**Bernstein**") owned New Town Parking, LLC ("**New Town**"), which in turn owned Parking Garage A. Bernstein also owned New Town Metro I, LLC ("**New Town Metro**"), which leased Parking Garage B from another party.

5.      Belcrest bought the Metro III building in 2015.  At that time Belcrest succeeded, by assignment, to the rights and obligations of the Tenant under the Ground Lease and the Ground Lease Amendment.

**The 2019 Assignment Agreement**

6.      At some time in or before 2019, Dewey decided to develop property that it owned, including the property that was subject to the Ground Lease.  The development could not proceed unless Dewey identified substitute parking for Belcrest.

7.      Dewey entered into an Assignment and Assumption of Parking Lease with New Town dated as of February 14, 2019 (the "**Assignment Agreement**").  The Assignment Agreement recited Dewey's desire to designate the top three floors of Parking Garage A as Permanent Substituted Leased Premises under the Ground Lease.  It also recited Dewey's desire to transfer, to New Town, "all of Assignor's right, title and interest in and to" the Ground Lease.

8.      Paragraph 3 of the Assignment Agreement required Dewey to send an "Exchange Notice" informing Belcrest of the parking substitution and to do so "[o]n or before September 30, 2021."  The effective date of the substitution (the "Transfer Date") was to be no earlier than "thirty (30) days following the date of the Exchange Notice."

9.      The Assignment Agreement required that the "Exchange Notice" be in substantially the following form:

> Dewey, L.C. is the Landlord and 6525 Belcrest Road LLC is the assignee Tenant under the lease referenced above (the "Parking Lease"). This letter constitutes an Exchange Notice pursuant to Section 6.1 of the Parking Lease.
>
> Tenant is hereby notified that effective _____, 20__ (the "Transfer Date"), the Leased Premises, as defined in the Parking Lease, will become the top three (3) floors of the structured parking garage known as "Parking Garage A" and located at 3325 Toledo Road, Hyattsville, Maryland 20872. Under the Parking Lease, space in Parking Garage A is expressly identified as a permitted Permanent Substituted Leased Premises.
>
> Garage A is owned by New Town Parking, LLC. Landlord has assigned its interest in the Lease to New Town Parking, effective as of the Transfer Date. To coordinate parking activity of your tenants (and permitted subtenants, if applicable), please contact New Town Parking at [insert contact info].
>
> Section 6.2 of the Parking Lease requires Tenant to execute and deliver such documents as Landlord may reasonably require to evidence the substitution of the Substituted Leased Premises for the Original Leased Premises, including, without limitation, an amendment to the Parking Lease. Accordingly, Landlord hereby requests that Tenant execute the enclosed Second Amendment to Parking Lease and return it to us. We will return a fully executed copy to you.

10.      The Assignment Agreement also required Dewey to include, with the Exchange Notice, a proposed Second Amendment to the Ground Lease, the form of which was set forth in another exhibit to the Assignment Agreement. However, Dewey and New Town agreed that a failure by Belcrest to execute the proposed Second Amendment would not affect the validity of the proposed assignment or the validity of the Exchange Notice.

11.      Section 5 of the Assignment Agreement provided that all rents payable under the Ground Lease prior to the "Transfer Date" were to belong to Dewey, but that rents payable after the Transfer Date were to belong to New Town. Section 7(m) of the Assignment Agreement stated that the parties did not intend its benefits to inure to any person or entity that was not a party to the agreement.

12.    Belcrest knew of Dewey's development plans and was active in opposing them, particularly as they might affect Belcrest's parking rights.  The history of many of those disputes is recounted in two published decisions by the Maryland courts.  *See 6525 Belcrest Rd. LLC v. Prince George's Cnty. Council*, No. 726, 2022 Md. App. LEXIS 335 (Md. Ct. Spec. App. May 4, 2022) and *6525 Belcrest Rd., LLC v. Dewey L.C.*, No. 1393, 2022 Md. App. LEXIS 763 (Md. Ct. Spec. App. Oct. 25, 2022).  However, Belcrest did not know of the Assignment Agreement (or of a later amendment to that agreement that is described below) until June 2022, after this Court ordered the production of certain documents in response to Belcrest's discovery requests.

**The May 2020 Notice of Substitution**

13.    Dewey sent a "Notice of Substitution" to Belcrest on May 5, 2020.  The Notice of Substitution designated 864 parking spaces in Parking Garage A and 142 spaces in Parking Garage B as the Permanent Substituted Leased Premises under the Ground Lease.  It also stated that the exchange would be effective on November 15, 2020.

14.    The full text of the May 5, 2020 Notice of Substitution was as follows:

This notice is sent on behalf of Dewey, LC. ("Landlord") to 6525 Belcrest Road, LLC ("Tenant") pursuant to the terms of the Ground Lease dated March 31, 1998 (Ex. 1), the First Amendment to the Ground Lease dated July 16, 2014 (Ex. 2), and the Assignment and Substitution of Ground Lease dated November 9, 2015 and recorded among the Land Records of the Circuit Court for Prince George's County on December 28, 2015 (Ex. 3).

Pursuant to Section 6.f of the First Amendment to the Ground Lease, this letter shall provide notice of New Permanent Substituted Lease Premises.  Tenant will be allocated 864 spaces in Garage A and 142 spaces in Garage B.  The spaces in Garage A will consist of the top 3.5 floors.  The location of Garage A is described more fully in Exhibit #4.  The Garage B spaces will be secured by issuance of parking cards.  Tenant will be issued 142 parking cards which will access 142 spaces.  The location of Garage B is described more fully in Exhibit #4.

Access to Garage A and Garage B will be through the same entrance currently used by parking patrons to those garages.  Parking will be administered by the current parking manager, Atlantic Parking.  The garage will be continued to be

maintained by existing staff.  The notice reiterates the invitation to address any parking administrative questions to Atlantic Parking, the parking manager.

This exchange of lease premises shall become effective on November 15th, 2020. Tenant will vacate the original leased premises and occupy the Permanent Substitute Leases *[sic]* premises on that date.  The Permanent Substituted Lease Premises has direct access from a public thoroughfare.  Tenant will be provided appropriate easements of access that comply with the Ground Lease and first amendment thereto.  The designation complies with the terms of the Ground Lease and first amendment thereto and complies with "all zoning and other applicable laws, rules and regulations."  This designation is consistent with prior communications to you through counsel dated March 10, 2020, March 18, 2020 and March 30, 2020.  This notice constitutes the Exchange Notice under Section 6.1 of the Ground Lease.

Should Tenant contest this Notice of Exchange and the substitution of leased premises, it may submit the issue to binding arbitration before the American Arbitration Association as required by Section 11.12 of the Ground Lease, the exclusive remedy for the resolution of any such claim(s).

15.    The Notice of Substitution that Dewey sent to Belcrest on May 5, 2020 differed from the Exchange Notice attached to the Assignment Agreement, and from other terms of the Assignment Agreement, in the following ways:

(a)    The Assignment Agreement stated that the Permanent Substituted Leased Premises would be located in the top 3.5 floors of Parking Garage A.  The May 2020 Notice of Substitution instead said that some spaces would be made available in Parking Garage A and that other spaces would be made available in Parking Garage B.  Parking Garage B was owned by an unrelated party and was leased by New Town Metro, not by New Town.  New Town Metro was not a party to the Assignment Agreement.  The parties offered no evidence to explain why space in Parking Garage B had been included in the May 5, 2020 Notice of Substitution.  They also did not explain how (or whether) the Parking Garage B spaces were subject to the Assignment Agreement in May 2020.

(b)      The Assignment Agreement required Dewey to disclose the Assignment
Agreement to Belcrest.  The May 2020 Notice of Substitution did not mention the
Assignment Agreement, and Dewey did not actually disclose it until June 2022.

(c)      The Assignment Agreement required Dewey to ask Belcrest to sign an
amendment to the Ground Lease.  The May 2020 Notice of Substitution did not refer to
any proposed amendment and did not ask Belcrest to execute any documents.

16.      By letter dated June 12, 2020, Belcrest asked for "concrete and definitive
documentation about Dewey's purported claims about having secured arrangements adequate
and sufficient to substitute" for Belcrest's parking rights.  The parties offered no evidence as to
how Dewey responded, except to confirm that Dewey did not provide Belcrest with a copy of the
Assignment Agreement at that time.

**The Arbitration**

17.      Belcrest contested Dewey's substitution notice, and Dewey commenced an
arbitration to resolve the parties' disputes.

18.      Belcrest argued that the arbitrator lacked authority over the parties' dispute.  It
also argued that Belcrest owned property rights under a variety of property, zoning and other
theories and that these rights were separate from (and superior to) any rights it might have under
the Ground Lease.  Belcrest further argued that it had property rights to the entirety of a larger
19.96 acre site of which the "Leased Premises" were only a part.

19.      On October 19, 2020, the arbitrator issued an order that granted partial summary
judgment in favor of Dewey on each of the issues mentioned in paragraph 18, above.  The
arbitrator held that the arbitrator had authority over the parties' dispute; that Belcrest did not own
an express or implied easement or any of the other separate property rights that Belcrest had

claimed; that the parties' relationship was governed solely by the Ground Lease (as amended); and that Belcrest's rights were limited to the property specified in the Ground Lease and did not extend to the larger 19.96 acre property. The arbitrator also declared that Dewey had a contractual right to make a parking substitution under the Ground Lease and the Ground Lease Amendment, while leaving open certain questions about the specific substitution that Dewey had proposed.

20.    The parties continued to litigate other issues relating to the substitute parking. Belcrest argued that any substitution had to give Belcrest legal rights of the same character that Belcrest had under its existing Ground Lease – *i.e.*, a recordable leasehold or similar interest in specific property. Belcrest also argued that Dewey should be required to prove that Dewey had secured enforceable rights to the substituted parking for the entire remainder of the term of the Ground Lease, which was not scheduled to expire until 2045.

21.    As noted above, the Assignment Agreement provided that the designated parking spaces would become the Leased Premises and that New Town would take over as lessor. Belcrest concedes that "most, if not all of the Debtor's arguments in the Arbitration would have been negated by the Assignment, since the Debtor would have retained all of its rights under the Ground Lease, only the Landlord and the location of the parking would be different." *See Debtor's Proposed Findings of Fact and Conclusions of Law*, ECF No. 196, at ¶ 147; *see also* Trial Tr. at 62:4-16. However, Dewey did not disclose the Assignment Agreement to the arbitrator or to Belcrest.

22.    On December 15, 2020, Dewey filed a second motion for partial summary judgment in the arbitration. Dewey argued that the Ground Lease did not require that Dewey have ownership or control over the property in which the substituted parking spaces would be

located.  Dewey also stated that New Town Parking LLC had "leased" 842 spaces in Garage A to Dewey and that New Town Metro I, LLC had "sublet" 142 parking spaces in Garage B to Dewey, and that these spaces would constitute the substitute parking.

23.     Before the submission of the December 15 motion papers the attorney for Dewey (Mr. Maloney) circulated a proposed affidavit to be executed by Joseph Galli of New Town.  The draft affidavit described the arrangement between New Town and Dewey as a "sublet" of parking spaces by New Town.  One of the principals of Dewey (Mr. DeCain) said in an email that he did not think the arrangement was a "sublet" with respect to Garage A, since New Town owned Garage A.  When counsel asked how the arrangement should be described, DeCain answered that "I would call [the Garage A arrangement] a primary lease (as opposed to a sublease).  In Garage B, I would call it a sublease."

24.     On December 15, 2020, Mr. Galli executed an affidavit that was submitted with Dewey's motion for summary judgment.  The Galli affidavit stated – as did the motion – that New Town Parking, LLC had "leased" 842 parking spaces to Dewey in Garage A and that New Town Metro I, LLC had "sublet" 142 parking spaces in Garage B to Dewey.

25.     Belcrest filed papers in opposition to Dewey's second motion for partial summary judgment.  Belcrest argued again that Dewey should be required to produce a lease or other enforceable agreement showing Dewey's control over the relevant parking spaces and showing that such control would extend through 2045.

26.     Dewey's counsel and others discussed how to respond to Belcrest's contentions. Mr. DeCain of Dewey said in an email dated January 7, 2021 that the Assignment Agreement provided the answer to Belcrest's complaints:

> [I]f I understand it correctly (and perhaps we don't want to get into this at this stage) but we are assigning the lease to Bernstein.  They are effectively becoming

the new landlord.  Dewey will not have a role going forward.  With the
assignment, Bernstein will have an obligation to honor the lease, just like Dewey
did.

Mr. Maloney (Dewey's counsel) responded that "[w]e don't want to get into potential

assignment of their lease, at least right now.  What can we say in the affidavit about the

relationship between Bernstein and Dewey which extends past 2045?"

27.     In another message on January 7, 2021, Mr. Maloney asked "what is the

agreement between Bernstein and Dewey that gives us the right to designate this parking in the

Exchange Notice?"  Mr. DeCain responded, "Well it is the assignment, but I think we do not

want to get into that, though I am not sure why."  Mr. Maloney then explained that a reference to

the assignment would introduce a new issue about which the arbitrator might want to have a

hearing.  Mr. Maloney proposed that the reply papers continue to refer to sublets of the relevant

spaces.

28.     Dewey's counsel sent draft reply papers to Mr. Galli of New Town, which

included a proposed supplemental affidavit that continued to describe the arrangements between

New Town and Dewey as leases and subleases.  Mr. Galli stated that the language was "cool

with me.  Winning is everything."  He then executed a supplemental affidavit that stated that the

New Town entities had leased and subleased the relevant parking spaces to Dewey.

29.     On January 8, 2021, Mr. DeCain sent an email after having re-reviewed the

Belcrest papers in opposition to summary judgment.  He said:

We need a game plan with how we are going to deal with this.  It is a legitimate
issue on their part – how have we proved that Bernstein in fact will provide the
parking if say something better comes along for them.  We need to be able prove
that.  And the only thing that does that is the assignment doc. Thoughts on how to
handle?

The parties were supposed to have an additional call to discuss the issue, but the evidence before

the Court does not disclose whether there were more discussions or what the outcomes were.  In

any event, the description of the arrangements between New Town and Dewey as "leases" and "subleases" continued, and the Assignment Agreement was not disclosed.

**The Second Notice of Substitution and Further Arbitration Proceedings**

30.    On January 7, 2021, Dewey sent a Supplemental Notice of Substitution that corrected the number of substituted parking spaces that would be made available.  It stated that 919 spaces would be available in Parking Garage A and another 142 spaces in Parking Garage B. It also stated that the exchange would be effective January 18, 2021.

31.    On February 14, 2021, the arbitrator issued a ruling on Dewey's second motion for partial summary judgment.  The order noted that the parties had agreed that the number of substitute parking spaces to be provided was to be 1061 (the number referenced in the corrected January 7, 2021 notice).  The arbitrator also held that the Ground Lease Amendment had eliminated any requirement that the substituted parking be provided on property owned by Dewey or by Belcrest and held that the Ground Lease Amendment permitted the use of Parking Garages A and B as substituted parking even though Dewey did not own those structures.  The arbitrator withheld decision (pending further evidence) as to whether Parking Garage B was accessible from a public thoroughfare and as to whether the relevant parking spaces were reserved for Belcrest's exclusive use or otherwise would be sufficient for Belcrest's needs.

32.    During the course of the February 14, 2021 ruling the arbitrator stated, as an "Uncontested Material Fact," that the substituted parking spaces had been leased and subleased by Dewey from New Town.  However, he also observed that Dewey had not provided documents showing how Dewey had secured rights to the substitute parking.  He denied Belcrest's demand for such documents, holding that it was the Landlord's continuing obligation

to ensure that the designated substituted parking would be available, and that Belcrest was not

entitled to know the details of how Dewey planned to satisfy that obligation.

33.      Dewey sent another supplemental notice of substitution on March 6, 2021.  (The

document bears a date of March 6, 2020, but the context makes clear that it was sent in 2021.)

The notice clarified that Belcrest would have exclusive rights to the designated substitute parking

spaces, which was one of the remaining disputed points in the arbitration.

34.      On March 22, 2021, Dewey filed a third motion for summary judgment.  In

response, Belcrest continued to argue that Dewey had not proved that it had made proper and

enforceable arrangements for the substitute parking.  Dewey again replied that Belcrest had no

contractual entitlement to "assurances" that the parking spaces would be available through 2045,

noting that the Ground Lease permitted substitutions "at any time" and "from time to time," so

that additional substitutions could be made by the Landlord if they were needed.

**The April 2021 Amendment to the Assignment Agreement**

35.      At the end of April 2021, while the third summary judgment motion was

pending, Dewey and New Town executed a First Amendment to the Assignment and

Assumption of Ground Lease.  In paragraph 2 of the amendment, the parties agreed that Dewey's

prior notices of substitution would satisfy the "Exchange Notice" requirements of the

Assignment Agreement.  However, they also agreed that the Transfer Date had not yet occurred

and that the Transfer Date "remained subject" to the issuance of a favorable arbitration decision:

> Assignor and Assignee hereby agree that the Exchange Notice requirements of the
> Assignment have been satisfied and the actual exchange of leased premises and
> the Transfer Date remains subject to the favorable outcome of the Arbitration
> whereby the substitute parking arrangement under Section 6.1 of the Parking
> Lease is immediately enforceable.  Upon Assignor receiving such a decision in
> the Arbitration, Assignor, working in conjunction with Assignee, will
> immediately commence the relocation of the parking from the current premises to
> the Substituted Leased Premises, which is anticipated to take up to 14 days to

fully implement from the date Assignee received notice thereof, time being of the essence, and the date Assignor provides Assignee with such notice shall be the Transfer Date.

36.     Paragraph 3 of the amendment made clear that the "Substituted Leased Premises" would include spaces in both Garage A and Garage B.  As noted above, the parties did not explain how the Garage B spaces could be made subject to the Assignment Agreement without the agreement of New Town Metro, which was the lessee and operator of Garage B.  However, the parties agreed that the spaces in Garage A and Garage B actually were made available to Belcrest until Belcrest rejected the Ground Lease.  The parties also have presented their cases and their arguments as though the Amendment to the Assignment Agreement effectively covered both the Garage A and Garage B spaces, so I will do the same.

37.     The amendment to the Assignment Agreement provided for a "Revenue Transfer Date" that would differ from the "Transfer Date," and stated that Dewey would retain all rights to rents payable under the Ground Lease until the "Revenue Transfer Date" occurred:

> Irrespective of the actual Transfer Date, the Net Annual Rent and Additional Rent shall continue to be paid to Assignor unless and until final, non-appealable approval of the two Detailed Site Plans that will allow Assignor's commencement of infrastructure construction on the Leased Premises. . . . For the avoidance of doubt, all Net Annual Rent or Additional Rent for the Parking Lease that is accrued prior to the Revenue Transfer Date, paid or unpaid as of the Revenue Transfer Date, if any, shall be retained by and/or delivered to Assignor upon payment.

Dewey further agreed that it would reimburse New Town for certain expenses between the Transfer Date and the Revenue Transfer Date:

> Assignor agrees that, until the Revenue Transfer Date, it shall be responsible and reimburse Assignee within thirty (30) days following receipt of an invoice for all incremental operating and other costs incurred by Assignee, to the extent not covered by the Parking Lease Tenant, that are associated with the use of the Substituted Leased Premises during such period.

**The Ruling on the Third Motion for Partial Summary Judgment**

38.    On May 18, 2021, the arbitrator granted Dewey's third motion for summary

judgment.  The arbitrator held that the Ground Lease did not require that Belcrest be given

"exclusive" access to parking spaces, and that Belcrest was only entitled to reasonable

assurances that the parking garages would not be filled to capacity by other users.  The arbitrator

also noted that in any event "exclusive" access was being provided.

39.    The arbitrator also rejected Belcrest's continuing argument that Dewey had to

prove its "control" over the substituted parking and that such control would not expire until

2045:

> The Arbitrator adopts the Claimant's contentions as set forth in its Reply in
> Support of its Third Motion for Summary Judgment.  In essence, the Ground
> Lease provides that the Landlord can make substitutions "at any time" and "from
> time to time" and includes no obligation for the landlord to give "assurances" to
> which Respondent maintains it is entitled.  When the First Amendment was
> executed, although Garages A and B were identified as permitted substitute
> facilities, neither of them was owned or controlled by Dewey.  There is no dispute
> of material fact on this issue.
>
> Again, [if] Respondent or its predecessor had wanted other provisions in the
> Ground Lease or First Amendment, the provisions could have been negotiated.
> Instead, the Respondent voluntarily accepted and agreed to the terms of the
> Ground Lease, as amended.

40.    Mr. DeCain sent an email to Mr. Galli and to a representative of Atlantic Parking

on May 19, 2021 that enclosed a copy of the arbitrator's May 18 ruling and that stated that the

Dewey parking lot should be closed prior to the workday on May 20, 2021, and that customers of

Belcrest should be directed to Garage A.

41.    The arbitrator issued a revised decision and order on May 19, 2020 that corrected

a minor error in the deadline for the filing of a request for the reimbursement of fees and costs.

**The Bankruptcy Filing, Stay Relief, and the Final Arbitration Award**

42.    Belcrest filed a voluntary chapter 11 petition in this Court on May 19, 2021.  On

May 31, 2021, Belcrest filed an adversary proceeding (Adv. Pro. No. 21-01140), seeking an

injunction that would have allowed Belcrest to continue to use the Dewey property for parking.

Belcrest argued that the automatic stay barred Dewey from changing the prior parking

arrangement and barred Dewey from enforcing the May 18, 2021 arbitration order.

43.    I denied Belcrest's request for entry of a temporary restraining order on June 3,

2021, ECF No. 7, Adv. Pro. No. 21-01140, but scheduled an evidentiary hearing to consider the

motion for a preliminary injunction.

44.    On June 4, 2021, Dewey submitted papers in opposition to Belcrest's motion for a

preliminary injunction.  ECF No. 8, Adv. Pro. No. 21-01140.  I take judicial notice that Dewey

made the following arguments:

(a)    Dewey argued that the automatic stay did not bar Dewey from

implementing the substituted parking arrangements because the arbitrator's decision on

that subject was final and enforceable when it was issued on May 18, 2021;

(b)    Dewey argued that the arbitrator's May 19, 2021 order had merely made a

clerical correction (changing the dates for further submissions to address fee awards) and

did not affect the finality and effect of the May 18, 2021 decision and order; and

(c)    Dewey submitted a declaration by Timothy Maloney (Dewey's counsel in

the arbitration), who represented that the arbitration "has now concluded" except for the

assessment of attorneys' fees and costs.  ECF No. 10, Adv. Pro. No. 21-01140, at ¶ 6.

45.    I held an evidentiary hearing on June 14 and 15, 2021 to consider the motion for a

preliminary injunction.  During that hearing Mr. DeCain testified that he had completed all steps

necessary to implement the substitute parking immediately after the issuance of the May 18 arbitration decision, and prior to the filing of Belcrest's bankruptcy petition.  Debtor's Exh. MM at 157, 159-160, 162.

46.     At the conclusion of the hearing on June 15, 2021, I denied the motion for an injunction for reasons that I dictated into the record.  ECF No. 30, Adv. Pro. No. 21-01140, at 79-98.  I also granted relief from the automatic stay to permit the conclusion of the arbitration, the enforcement of the parking substitution, and the completion of other pending state court proceedings.  I entered an order to that effect on June 17, 2021.  ECF No. 28, Adv. Pro. No. 21-01140.

47.     The Arbitrator entered a final award on August 12, 2021.  The award required Belcrest to comply with the parking substitution and directed that Belcrest pay $23,812.19 to Dewey to reimburse Dewey for fees of the arbitrator that Dewey had advanced.

**The Lease Rejection**

48.     On September 14, 2021, Belcrest filed a motion to reject the Ground Lease under section 365 of the Bankruptcy Code.  ECF No. 32.  Belcrest's papers made clear that the economics of the Ground Lease did not make sense:

(a)     Paragraph 12 of Belcrest's motion stated that Belcrest had made alternative parking arrangements and had negotiated lease amendments with its tenants that would be less costly and that "the economics of the Ground Lease in combination with these factors and the present costs of the rent paid under the Ground Lease support the rejection of the Ground Lease."

(b)      Paragraph 12 also stated that "Although the Debtor will lose income from the rejection of the Contracts, the loss is substantially less than the rent paid under the Ground Lease and the Debtor submits that it will see a net gain with respect thereto."

(c)      Paragraph 19 of the motion stated that the minimum rent under the Ground Lease was $690,000 per year plus taxes and insurance costs, but that at current occupancy levels the Debtor needed only approximately 100 parking spots, which the Debtor could obtain at a cost of less than $20,000 per month.

(d)      In paragraph 20 of the motion, Belcrest represented that:

[I]n the short run, given the Debtor's current needs, both from a zoning perspective and a business perspective, the Debtor currently does not require the number of parking spots that would be provided under the Ground Lease. The Debtor will save significant monies by the rejection of the Contracts, and this will allow it to refocus and reshape its rental plans. The effect of the rejection will be cash positive for the Debtor.

(e)      Footnote 3 on page 8 of the motion stated that the annual costs under the Ground Lease (including taxes and insurance) exceeded $915,000 annually and that net income from Belcrest's use of the parking was only $323,000 in 2020.

(f)      Paragraph 21 of the motion stated that Belcrest had made new arrangements for 200 spaces in Parking Garage A and that Belcrest's parking expenses would decline by $30,000 to $40,000 each month.

49.      On October 4, 2021, I entered an Order that approved the rejection of the Ground Lease. The Order included a finding (proposed by Belcrest) that the Ground Lease was a "burden" to Belcrest. At Belcrest's request, and without objection, the rejection was made effective as of October 1, 2021. The Order also stated that claims based on the rejection could be filed within thirty days after the entry of the Order.

50.     The parties agreed at trial that the substitute parking designated in Parking Garage A and Parking Garage B was actually available for use by Belcrest and its customers from May 19, 2021 through the effective date of the Ground Lease rejection, and that Belcrest and its customers had made some use of such parking.

51.     Dewey filed a proof of claim on September 9, 2021, and filed amended proofs of claim on October 5, 2021 and November 2, 2021.  Those claims and amendments were timely filed in accordance with deadlines set by the Court.

**Subsequent Proceedings/Disclosure of the Assignment Agreement**

52.     The Maryland state court confirmed the arbitration award and decisions in a final order dated October 5, 2021.

53.     On February 15, 2022, I heard argument on Dewey's motion that Belcrest should be compelled to pay rents that had accrued after the filing of the bankruptcy case and prior to the rejection of the Ground Lease.  Belcrest argued that it had offset rights arising out of prior overpayments of taxes and other sums.  I declined to order payment of rents at that time because of the factual issues that had been raised.

54.     I take judicial notice of positions taken by the parties during the February 15, 2022 hearing.  I noted during that hearing that it was unclear just how Dewey's arrangements with New Town had been structured.  I asked who was collecting rents and why Dewey was making a motion for payment of post-petition taxes on the New Town space.  Dewey responded that there was a "pass-through" arrangement between Dewey and New Town and that monies paid to Dewey for rent would go to New Town.  I said that it sounded as though Dewey had assigned the Ground Lease to New Town, and Mr. DeCain stated that that was correct.  I then asked why Dewey was making the motion if the Ground Lease had been assigned, and Dewey's

counsel stated that although there was a "pass-through" arrangement the parties to the Ground Lease were still Belcrest and Dewey.

55.     On March 1, 2022, Dewey's counsel advised the Court that his comments at the February 15, 2022 hearing had been incorrect, and that Dewey was not obligated to pay rents over to New Town.

56.     The parties' attorneys exchanged further emails without reaching agreement as to Belcrest's discovery demands.  I then held a conference to resolve the issues, at which I instructed Dewey to disclose any agreements it had entered into with New Town.  In June 2022, Dewey for the first time provided Belcrest with copies of the Assignment Agreement and the amendment to the Assignment Agreement.

**Maryland Court Rulings**

57.     Belcrest filed an appeal from the Maryland court's October 5, 2021 confirmation of the arbitration award.  In October 2022, Belcrest filed a motion seeking a stay of proceedings in that appeal.  Belcrest contended that the arbitration decision had been procured by fraud and that Dewey had "made false representations to the Arbitrator regarding a material issue in the Arbitration and procured a false affidavit from a third party in support of its false representations to the Arbitrator, which the Arbitrator relied upon in rendering the Award."

58.     Dewey opposed Belcrest's motion to stay the pending appeal.  Dewey argued that parking spaces had actually been provided to Belcrest from the time the substitute parking was implemented through the rejection of the Ground Lease; that the arbitrator had found that Dewey had no obligation to give Belcrest the contractual "assurances" that Belcrest wanted or to reveal the details of how Dewey had arranged the parking; and that it was immaterial to the arbitration

whether substitute parking had been obtained under a lease, a sublease, an assignment, or some combination thereof.

59.    On October 25, 2022, the Maryland appellate court denied Belcrest's motion for a stay.  It also denied Belcrest's separate contentions that the issues were moot in light of the rejection of the Ground Lease, and it affirmed the lower court's confirmation of the arbitration decisions.

60.    On February 22, 2023, Belcrest filed a Verified Amended Petition in the Maryland state court, seeking to vacate its prior confirmation of the arbitration award.  Belcrest argued that Dewey had falsely stated during the arbitration that Dewey had "leased" and "subleased" space in Parking Garages A and B, and that Dewey had obtained false affidavits from Mr. Galli confirming the existence of such "leases" and "subleases."  Belcrest argued that the arbitrator had accepted these representations as material facts not genuinely in dispute; that Dewey actually was not a party to any lease or sublease and therefore it had no actual rights to use the substitute parking that it had designated; and that the second summary judgment decision had been based on false and inaccurate statements.  Belcrest also argued that in light of the assignment Dewey was no longer the Landlord at relevant times.

61.    Dewey filed a motion to dismiss Belcrest's Verified Amended Petition on May 5, 2023.  Dewey argued (among other things) that it was not required to lease or sublet parking spaces in order to designate them as substitute parking under the Ground Lease; that it was Dewey's obligation to ensure the substitute parking would be available, but that there were no particular means by which Dewey was obligated to do so; that the arbitrator had decided that Belcrest was not entitled to any assurances as to Dewey's rights as to the alternative parking or

any further disclosures as to the agreements between Dewey and New Town; and that the alleged misstatements were neither fraudulent nor material.

62.     Dewey and Belcrest have advised me that the Maryland court has granted Dewey's motion to dismiss Belcrest's petition to vacate the confirmation of the arbitration award.  The order granting the motion is dated August 15, 2023.  Belcrest contended that the order was not publicly available until the week of October 2, 2023, and it asked the Maryland court to revise and reissue the order so that Belcrest's appeal period would not have expired. The Maryland court denied that motion on November 9, 2023.

63.     The parties have informed me that Belcrest has filed additional appeals in Maryland from the denial of its motion to vacate and the denial of its request for a reissuance of the August 15, 2023 order.  However, I do not believe that I need to wait for the conclusion of any additional appeals in Maryland before resolving the dispute that is before me.

## Discussion

Many of the parties' arguments require an interpretation of the Assignment Agreement and a determination of when its provisions became effective.  Neither party has been consistent in its arguments on these points.

Belcrest has argued to the Maryland state court that Dewey had no sublease or lease with New Town, and that Dewey therefore had no legal basis on which to make Parking Garages A and B available to Belcrest as substitute parking.  Trial Tr. at 18:11-23; Belcrest Trial Exh. KK, ¶ 45 (arguing that "no lease or sublease for the Permanent Substituted Leased Premises had ever existed" and therefore that "there was no legal basis upon which Dewey . . . could have possibly provided the Permanent Substituted Leased Premises" to Belcrest).  In this Court, however, Belcrest contends that the Assignment Agreement with New Town actually took effect in 2020

(or no later than January 2021), so that New Town (not Dewey) was the new landlord under the Ground Lease and was the only person entitled to file a proof of claim following the rejection of the Ground Lease. Those contentions cannot both be true. If the Assignment Agreement actually took effect (as Belcrest argues here), then the Assignment Agreement itself would have provided the "legal basis upon which" Dewey made the substituted parking available. Parking Garages A and B would have become the new "Leased Premises," and Belcrest would have had exactly the rights that it repeatedly said it wanted (namely, an enforceable leasehold right to the parking spots).

Dewey has argued that the "Transfer Date" under the Assignment Agreement (as amended by the First Amendment) did not occur until the issuance of the final arbitration award on August 12, 2021, or perhaps until the state court's confirmation of the arbitration award on October 6, 2021. Trial Tr. at 69:2-24. As discussed below, there is merit to Dewey's argument that the separate "Revenue Transfer Date" did not occur until after the arbitration proceedings and appeals were resolved. The "Transfer Date," however, was triggered by the issuance of a favorable arbitration decision. Dewey and New Town treated the May 18, 2021 arbitrator's decision as the event that triggered the Transfer Date, and Dewey's counsel admitted, at trial, that Dewey and New Town actually thought that the Transfer Date had occurred in May 2021. Trial Tr. at 70:2-74:19.

In order to sort through the many conflicting arguments that the parties have made, it is first necessary to look beyond the parties' inconsistent contentions and to determine just what the Assignment Agreement (including the First Amendment to the Assignment Agreement) actually provided, and when its various terms became effective.

I.      **Effectiveness of the Assignment Agreement and Its First Amendment**

I hold that the "Transfer Date" occurred on May 18, 2021 (the date of the arbitrator's

final summary judgment decision) and that the Assignment Agreement (as amended) took effect

on that date.  The parties' arguments to the contrary are without merit.

A.      **Belcrest's Contentions**

The original Assignment Agreement said that it would be effective upon the "Transfer

Date."  The Transfer Date was defined as the date that would be specified in an Exchange Notice

as the date on which space in Garage A would become the Permanent Substituted Leased

Premises under the Ground Lease.  Dewey sent a "Notice of Substitution" on May 7, 2020 that

designated spaces in Garage A and Garage B as the "Permanent Substituted Leased Premises"

and that stated that the substitution would be effective on November 15, 2020.  Belcrest argues

that the Assignment Agreement therefore was effective, and the Transfer Date occurred, on

November 15, 2020.  There are a number of reasons why this is not correct.

First, Belcrest itself disputed the validity and effectiveness of the Notice of Substitution

and whether it complied with the requirements of the Ground Lease.  Belcrest argued, among

other things, that the May 2020 Notice of Substitution had not covered the correct number of

parking spaces.  Dewey acknowledged the mistake and sent a Supplemental Notice of

Substitution dated January 7, 2021 that increased the number of spaces that would be made

available.  That supplemental notice stated that the substitution would become effective on

January 18, 2021 – making clear, by implication, that the substitution had not yet occurred.

Belcrest's counsel acknowledged at trial that the Assignment Agreement was premised

on the issuance of a substitution notice that was valid under the Ground Lease.  He also

acknowledged that Belcrest could not contend that a notice of substitution was somehow

effective for purposes of the Assignment Agreement if the same notice was not valid and effective for purposes of the Ground Lease itself.  Trial Tr. at 44:24-45:15.  The original Notice of Substitution designated the wrong number of parking spots, and by Belcrest's own prior admissions the notice therefore was not effective under the Ground Lease.  Accordingly, the substitution could not have become effective (and the assignment to New Town could not have become effective) in November 2020.

Second, the Assignment Agreement contemplated that Dewey would send a notice that would designate spaces in "Garage A" as the "Permanent Substituted Leased Premises."  Dewey did not do so.  Instead, the May 2020 Notice of Substitution and the January 2021 Notice of Substitution designated spaces in Garage A and Garage B as substitute parking.  The Assignment Agreement did not include any rights or agreements with respect to parking in Garage B, and there is nothing in the record that suggests that as of May 2020 or January 2021 Dewey had entered into any agreement by which any of the Landlord's rights could be assigned to the owner or lessee of the Garage B spaces.

Third, and most importantly, Dewey and New Town entered into an amendment to the Assignment Agreement in late April 2021 that changed their agreement as to when the "Transfer Date" would occur.  The parties agreed in the amendment that the requirements of the original Assignment Agreement regarding the sending of "Exchange Notices" had been satisfied. They therefore waived any inconsistencies between the various prior Notices of Substitution and the terms of the original Assignment Agreement.  At the same time, however, they agreed that the Transfer Date had not yet occurred, and that it would not occur until the issuance of a "favorable outcome of the Arbitration whereby the substitute parking arrangement under section 6.1 of the Parking Lease is immediately enforceable."

Belcrest points to the parties' agreement that the prior Exchange Notices were sufficient and argues that I should therefore hold that the Transfer Date had already occurred. Trial Tr. at 48:9-49:20. This makes no sense. The same agreement in which the parties waived any deficiencies in the prior notices also set forth the parties' agreement that the Transfer Date had not yet occurred and would not occur until the issuance of a favorable arbitration decision. I cannot make rulings based on one part of that agreement while ignoring the rest of it.

Even if the Transfer Date arguably had occurred under the terms of the original Assignment Agreement (either in November 2020 or in January 2021), as Belcrest contends, there was no reason why Dewey and New Town could not agree to change the effective date of the assignment as they saw fit. The Assignment Agreement was between Dewey and New Town. They reserved their rights to amend it (in paragraph 7(a)), and in paragraph 7(m) they disclaimed any intent to grant rights to third party beneficiaries. Belcrest had steadfastly refused to accept the validity of the substitution notices, and Belcrest was not using the proposed substitute parking spaces at the time the amendment was executed. Belcrest had effectively thwarted any effort to implement the substitution. Under these circumstances, there is no reason why Dewey and New Town could not modify their agreement to confirm that the "Transfer Date" had not yet occurred and that it would not occur unless and until the arbitrator ruled that the substitution was valid and effective. Belcrest insists that somehow this could not be done, but Belcrest cites no legal authority or legal principles that would support its contention.

### B.    Dewey's Contentions

Under the First Amendment to the Assignment Agreement the "Transfer Date" was to occur after the issuance of a favorable ruling in the arbitration, at which point Dewey was to notify New Town of that favorable decision. On May 18, 2021, the arbitrator entered the third

summary judgment decision, which decided the remaining issues in favor of Dewey. Dewey now contends, though, that the Transfer Date did not occur until after the filing of Belcrest's bankruptcy petition, and arguably did not occur until the arbitration award was confirmed on August 12, 2021, or perhaps until the arbitration award was confirmed by the Maryland court on October 6, 2021.

There is no merit to Dewey's contentions. The terms of the parties' agreements, the evidence at trial, and Dewey's own prior arguments make clear that the Transfer Date occurred on May 18, 2021.

First, it is plain from the facts at trial that Dewey and New Town treated the entry of the May 18, 2021 decision as the "favorable outcome of the Arbitration" that made the substitute parking "immediately enforceable" and that gave rise to the Transfer Date under the First Amendment to the Assignment Agreement. Dewey gave notice of the May 18, 2021 arbitration decision to New Town and confirmed Dewey's intention to enforce the substitution. Mr. DeCain (on behalf of Dewey) and Mr. Galli (on behalf of New Town) each testified at trial that they believed that the notice that Dewey sent to Mr. Galli after the entry of the arbitrator's third summary judgment decision was the notice contemplated by section 2 of the First Amendment to the Assignment Agreement, to the effect that the substitution had become immediately enforceable and therefore that the Transfer Date had occurred. Trial Tr. 159:9-160:15; 186:3-187:2; 189:20-25. Dewey also sent notice to Belcrest that the substitute parking was taking effect and that further access to the Dewey property would be denied. Dewey's counsel acknowledged at trial that the two parties to the Assignment Agreement actually believed that the Transfer Date had occurred on May 18, 2021.

Second, a portion of Dewey's claim relates to real estate taxes and utility costs that are payable as "Additional Rent" with respect to the "Leased Premises." When Dewey computed those "additional rents," Dewey allocated portions of the total real estate taxes and utility charges payable from and after May 18, 2021 by New Town with respect to Garage A. Those taxes and utility charges would only be relevant to the calculation of Additional Rent if, in fact, Garage A had actually become part of the "Permanent Substituted Leased Premises" in May 2021. That could only be the case if the "Transfer Date" occurred in May 2021.

Third, when Belcrest argued in this Court (shortly after the commencement of the bankruptcy case) that the substitution of new parking spaces would violate the automatic stay, Dewey responded that the substituted parking arrangement had already been accomplished prior to the filing of the bankruptcy case, and therefore prior to the invocation of the automatic stay. That contention by Dewey is irreconcilable with Dewey's current contention that the "Transfer Date" did not even occur until after Belcrest filed its bankruptcy petition.

Dewey argued at trial that the arbitrator issued a clarifying order on May 19, 2021 and that this should be regarded as the effective date of the arbitrator's ruling. However, that clarifying order merely changed the dates by which applications for awards of fees and costs were to be submitted. Dewey argued in June 2021 that the clarifying order did not affect the finality of the May 18, 2021 Order, and I agree. The favorable decision that triggered the Transfer Date was issued on May 18, 2021, not later.

## II.    Dewey's Standing To Assert a Claim

Belcrest contends that if the "Transfer Date" occurred on May 18, 2021 then New Town (not Dewey) was the "landlord" under the Ground Lease, and therefore that New Town was the

only party who had the right to file a proof of claim.  Belcrest and Dewey agreed that this is a

legal issue to be resolved by the Court.  Trial Tr. at 41:7-42:15.

The amendment to the Assignment Agreement made clear that the occurrence of a

"Transfer Date" did not result in the transfer of all rights that Dewey owned as landlord under

the Ground Lease.  Instead, the amendment set forth a separate definition of the "Revenue

Transfer Date" that described the point at which the rights to receive rents under the Ground

Lease would be transferred.  The parties agreed (in section 4 of the amendment) that

"[i]rrespective of the Transfer Date, the Net Annual Rent and Additional Rent shall continue to

be paid to Assignor unless and until final, non-appealable approval of the two Detailed Site

Plans" that would allow Dewey to complete the construction that it planned.  Dewey "retained"

all rights to rents that "accrued" and were "paid or unpaid" prior to that date:

> For the avoidance of doubt, all Net Annual Rent or Additional Rent for the
> Parking Lease that is accrued prior to the Revenue Transfer Date, paid or unpaid
> as of the Revenue Transfer Date, if any, shall be retained by and/or delivered to
> Assignor upon payment.

*See* Amendment, § 4.  The evidence at trial made clear that the Revenue Transfer Date did not

occur until long after Belcrest's rejection of the Ground Lease and long after the filing of

Dewey's proof of claim.

Belcrest argues that Dewey assigned "all" of its right, title and interest in the Ground

Lease on the Transfer Date, citing language that appeared in the original Assignment Agreement.

In Belcrest's view, that means that Dewey did not "retain" any rights of the lessor, so that any

rights that Dewey had to receive money after the Transfer Date just represented monetary claims

that Dewey had against New Town.  These arguments ignore the plain language of the First

Amendment to the Assignment Agreement.  While it is true that the original Assignment

Agreement stated that Dewey would transfer "all" of its rights to New Town, that agreement was

later amended, and the First Amendment made clear that rents all rents would "continue to be paid" to Dewey (not to New Town) until the Revenue Transfer Date occurred. The First Amendment also stated clearly that Dewey "retained" all rights to such rents. These agreements take precedence over any general language in the prior Assignment Agreement and make clear that Dewey still owned the Landlord's rights to receive rent payments from Belcrest.

The "Revenue Transfer Date" had not occurred at the time the Ground Lease was rejected. Belcrest argues that Dewey should only be entitled to claim damages for the portion of the remaining Ground Lease term that ran through the Revenue Transfer Date. I will discuss this argument further below when I discuss the amount of Dewey's allowed claim. Suffice it to say here that even if Belcrest were correct, it would only affect the amount of Dewey's allowed claim, and not Dewey's standing to assert a claim.

I hold that Dewey was entitled to file a proof of claim for damages caused by the rejection of the Ground Lease. It is not necessary to address Dewey's contentions that it was still the "landlord" because an assignor arguably remains liable on a contract following an assignment.

## III.    Belcrest's Estoppel Claims Lack Merit

Belcrest argued in the Joint Pretrial Order that Dewey should be estopped from relying on the existence of the First Amendment to the Assignment Agreement and should be relegated to whatever position Dewey would have occupied if the Assignment Agreement were in place but the First Amendment had not been signed. Belcrest has argued more generally in its post-trial papers that Dewey should be estopped from asserting that it is the Landlord under the Ground Lease. In each case, Belcrest's arguments are premised on its contention that Dewey fraudulently misrepresented to the arbitrator that Dewey had entered into leases and subleases

with New Town, and that Dewey intentionally concealed the existence of the Assignment
Agreement and the First Amendment to that agreement.

I cannot and will not condone the conduct by Dewey and its counsel during the
arbitration.  The assertion that Dewey had rights under "leases" and "subleases" was a
contrivance – a loose and knowingly inaccurate characterization of the fact that New Town was
willing to make parking spaces available, and a deliberate misstatement of what the contractual
arrangements between New Town and Dewey actually were.  The contemporaneous emails show
that Dewey and its counsel were aware that it was the Assignment Agreement (not any purported
lease or sublease) that formed the basis of Dewey's rights to designate the parking spaces in
Garage A and Garage B as substitute parking.  The record also shows that Dewey and its counsel
decided not to disclose the Assignment Agreement because counsel believed that doing so might
somehow further complicate the arbitration proceedings.  In other words, the mischaracterization
was knowing and deliberate.  I will direct the parties to deliver a copy of this decision to the
relevant Maryland state bar authorities for consideration by them as to whether the misstatements
to the arbitrator warrant any further action or any discipline of counsel.

While the conduct of Dewey and its counsel was improper and inexcusable, however,
that conduct does not support Belcrest's contention that an "estoppel" should apply.

Belcrest has broadly invoked the doctrine of "equitable estoppel" in its post-trial
submission, but it appears from Belcrest's contentions that it is actually invoking the doctrine of
"judicial estoppel" as well as a claim of "equitable estoppel."  "[J]udicial estoppel . . . precludes
a party who assumed a certain position in a prior legal proceeding and who secured a judgment
in his or her favor from assuming a contrary position in another action simply because his or her
interests have changed."  *Abramovich v. Harris*, 227 A.D.2d 1000, 643 N.Y.S.2d 811, 812 (N.Y.

App. Div. 1996) (*quoting Prudential Home Mtge. Co. v. Neildan Constr. Corp.*, 209 A.D.2d 394,

618 N.Y.S.2d 108, 110 (N.Y. App. Div. 1994)).  "Equitable estoppel" is more broadly the

principle by which:

> [A] party is absolutely precluded from denying, or asserting the contrary of, any
> material fact that, by the party's words or conduct, either affirmative or negative,
> the party has intentionally or negligently induced another, who had a right to rely
> upon such words or conduct, to believe and act upon them, thereby changing
> positions in such a way that the other party would suffer injury if a denial or
> contrary assertion were allowed."

57 N.Y. Jur. 2d Estoppel, § 3 (*citing Triple Cities Const. Co. v. Maryland Cas. Co.*, 4 N.Y.2d

443 (1958) (other citations omitted).  Although the two doctrines have somewhat different

purposes and elements, in each case "the party who is to be estopped . . .must have asserted a

fact or claim, or made a promise, that a court relied on or that another party relied on . . . and

then later attempted to take a contradictory stance."  *Republic of Ecuador v. Chevron Corp.*, 638

F.3d 384, 395-6 (2d. Cir. 2011) (*quoting Maitland v. Univ. of Minn.*, 43 F.3d 357 364 (8th Cir.

1994)).

Belcrest contends that Dewey has taken inconsistent positions in different proceedings,

that the arbitrator relied upon Dewey's prior misrepresentations about the nature of Dewey's

agreements with New Town, that Belcrest relied on Dewey's misrepresentations, and that

Belcrest was injured by that reliance.  Belcrest is wrong on each one of these separate points.

### A.    Whether Dewey Has Taken Inconsistent Positions

Belcrest says that Dewey's arguments about "leases" and subleases should estop Dewey

from contending that it was entitled to file a proof of claim arising out of the rejection of the

Ground Lease.  This makes no sense.  Dewey's statements about leases and subleases were

inaccurate, but that does not mean they were inconsistent with Dewey's right to file a rejection

damages claim.

Belcrest also has argued that Dewey should be estopped from contending that Dewey was still the Landlord at the time the Ground Lease was rejected. Trial Tr. at 56:1-57:4. But Dewey never said anything during the arbitration that suggested that somebody else was the Landlord. Its statements about "leases" and "subleases" did not have that effect.

It is Belcrest (not Dewey) who has invoked the terms of the Assignment Agreement in this proceeding. Belcrest argues that as a result of the Assignment Agreement Dewey allegedly did not have standing to file a proof of claim. I have considered the merits of that argument above. In terms of the estoppel claim, the fact is that Dewey said nothing during the arbitration about the terms of the Assignment Agreement or its effects on Dewey's standing to file a claim. The arbitration therefore provides no basis for an "estoppel" as to whether the Assignment Agreement affects Dewey's right to assert a claim.

What Belcrest actually has asked the Court to do, under the guise of its "estoppel" arguments, is to bar Dewey from relying on the First Amendment to the Assignment Agreement (which postponed the Transfer Date and introduced the new concept of a Revenue Transfer Date), while at the same time permitting Belcrest to rely upon the terms of the original Assignment Agreement in support of Belcrest's contentions that Dewey transferred all rights and claims to New Town and therefore lacks standing to file a claim. Perhaps an "estoppel" of this kind might have been warranted if, for example, Dewey had disclosed the original Assignment Agreement in the arbitration but had falsely stated that the agreement had never been amended. Dewey did no such thing. Dewey did not mention the Assignment Agreement at all. There is nothing about Dewey's prior silence that would or should justify a determination by this Court that Dewey's rights should be assessed by severing the original Assignment Agreement from its later amendment.

### B.    Alleged Reliance by the Arbitrator

Belcrest is wrong in contending that the arbitrator "relied" on Dewey's prior statements in a way that affected the outcome of the arbitration proceeding.  One of the arbitrator's decisions referred to Dewey's contentions about leases and subleases as uncontested facts.  But the arbitrator held in that same decision that the Ground Lease permitted the parking substitution, that the Landlord would be permitted to make further substitutions if they became necessary, that the details of Dewey's arrangements with New Town were not relevant and that Belcrest had no right to obtain any further information about those arrangements.  The arbitrator reconfirmed those rulings in the May 18, 2021 decision.

It is also apparent that the Assignment Agreement (if it had been disclosed) would not have led to a different result in the arbitration.  Belcrest concedes in its post-trial papers that "most, if not all of the Debtor's arguments in the Arbitration would have been negated by the Assignment, since the Debtor would have retained all of its rights under the Ground Lease, only the Landlord and the location of the parking would be different."  *See Debtor's Proposed Findings of Fact and Conclusions of Law*, ECF No. 196, at ¶ 147; *see also* Trial Tr. at 62:4-16.  The terms of the Assignment Agreement provided such a clear and complete answer to Belcrest's objections that it is a mystery to this Court why Dewey did not disclose it.  In any event, the Court finds that the failure to disclose the existence of the Assignment Agreement was not relied upon by the arbitrator and did not alter the outcome of the arbitration.

### C.    Alleged Reliance by Belcrest

Belcrest itself did not rely, to its detriment, on the statements that Dewey made during the arbitration.  What Dewey actually said during the arbitration was that it had entered into leases and subleases with New Town.  I have reviewed the papers submitted during the course of the

arbitration, and it is quite clear that Belcrest did not accept Dewey's statements. Instead, Belcrest continued to ask for disclosure of the actual agreements between Dewey and New Town, as well as to argue that "lease" and "sublease" arrangements were legally insufficient. In no way did Belcrest "rely" to its detriment on the purported existence of such leases and subleases.

Belcrest's real contention is that it was Dewey's concealment of the Assignment Agreement (rather than the affirmative statements that Dewey made about leases and subleases) that allegedly harmed Belcrest. However, the arbitrator's decision made clear that Dewey had no affirmative obligation to disclose the Assignment Agreement to Belcrest. The arbitrator noted that the terms of Dewey's agreements with New Town had not been made available, and rejected Belcrest's persistent requests for discovery of such terms, holding that Belcrest had no right to see them. The mere failure to disclose the existence of the Assignment Agreement therefore did not deprive Belcrest of information that it was entitled to have, and did not give rise to a proper estoppel claim.

### D.    Belcrest Was Not Injured by Dewey's Prior Statements

Finally, the evidence did not support Belcrest's contention that it was injured by the failure to disclose the existence of the Assignment Agreement.

As noted above, Belcrest has conceded that disclosure of the Assignment Agreement actually would have been favorable to Dewey's case during the course of the arbitration. The Maryland state court has implicitly reached that same conclusion, as it has denied Belcrest's petition to vacate the confirmation of the arbitration award.

Belcrest argued at trial that if it had known of the existence of the Assignment Agreement it would have attempted to negotiate a modification of the Ground Lease with New Town, under

which New Town might have agreed to lower rents. Belcrest contends that such a modification

might have made it unnecessary to reject the Ground Lease. However, until the occurrence of

the Revenue Transfer Date it was Dewey (not New Town) who continued to own the rights to

the Rents and Additional Rents that were payable under the Ground Lease. The premise of

Belcrest's contention – that New Town somehow could have elected to compromise that claim

without Dewey's agreement – is wrong.

Nor is there any evidence that New Town would been receptive to a modification of the

Ground Lease, even if New Town had been entitled to make that decision. Mr. Galli (the New

Town representative) certainly knew about the existence of the Assignment Agreement. If he

had had any ability to renegotiate terms, or any interest in doing so, he could have initiated such

a discussion with Belcrest. The evidence showed instead that New Town was working in

cooperation with Dewey.

Belcrest also failed to show that its hypothetical modification of the Ground Lease would

have made sense. Parties sometimes agree to modify contracts or leases to avoid rejections in

bankruptcy, but if they do so it is usually because the rejection damages claim will not be paid in

full and because the debtor might take its future business elsewhere in the absence of a

modification. In this case, Belcrest will pay the rejection damages claim in full. In addition, the

evidence showed that Parking Garage A was the most convenient location for Belcrest's

customers. If New Town had an interest in having Belcrest as a parking customer, New Town

could have entered into a new lease with Belcrest following a rejection of the Ground Lease,

without sacrificing any of the Landlord's rights to seek damages under the prior Ground Lease.

Belcrest posits that New Town might have willing, instead, to provide future parking

arrangements through a modification to the existing Ground Lease, thereby giving New Town

essentially the same future parking terms while in the process throwing away the rejection damages claim for nothing in return.  Belcrest provided no economic analysis that would have shown that such a decision would have been a reasonable one, let alone a likely one.

The only evidence that Belcrest offered regarding a hypothetical modification of the Ground Lease was the testimony of Belcrest's principle (Mr. Mehta), who speculated without foundation that a modification might have been negotiated.  Trial Tr. at 215:18-217:18, 221:24-222:22, 224:1-18.  This testimony was self-serving and not credible.  No evidence was offered to support Belcrest's contention that other parties would have been willing to negotiate changes to the Ground Lease that would have prevented the rejection of the Ground Lease and thereby eliminated the right to file a proof of claim for rejection damages.

## IV.    Belcrest's "Unclean Hands" Arguments Lack Merit

Belcrest has argued in the alternative that I should bar or limit Dewey's claim because Dewey is guilty of "unclean hands."  Belcrest acknowledges that "unclean hands" is an equitable defense that is not available as a defense to legal claims.  *See, e.g., Aetna Cas. and Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 607 (2d Cir. 2005); *Gala Jewelry, Inc. v. Harring*, No. 05 Civ. 7713 (GEL), 2006 U.S. Dist. LEXIS 91449, at *5 n.3 (S.D.N.Y. Dec. 18, 2006) ("[T]his circuit restricts the 'unclean hands' doctrine to suits in equity, thereby categorically defeating defendant's attempted defense in this suit at law.").  Belcrest argues that there is an exception under which "unclean hands" may be asserted as a defense where "plaintiff seeks to reap the fruits of his own immoral conduct."  *Debtors' Proposed Findings of Fact and Conclusions of Law* ¶ 151, *citing In re Ampal-American Israel Corp.*, 545 B.R. 802, 811 (Bankr. S.D.N.Y. 2016).  What the *Ampal* decision actually held, however, is that the related legal doctrine of "*in pari delicto*" can bar legal relief if the allegedly wrongful conduct is directly related to the

subject matter of the litigation.  *Id.*  There is no contention that the defense of "*in pari delicto*" is relevant to the proof of claim that Dewey has filed.

In any event, even if Belcrest were right, it is plain that Dewey's alleged misconduct is not "directly related" to the subject matter of this litigation.  The subject matter of this proceeding is the proof of claim that Dewey filed based on the rejection of the Ground Lease.  I have already held, for the reasons stated above, that Dewey was entitled to file that claim.  There is nothing about Dewey's misconduct during the arbitration that is "directly related" to the subject matter of the rejection claim itself.

I have also found that Belcrest was not injured by any of the conduct that allegedly constituted "unclean hands" on the part of Dewey.  Belcrest's counsel agreed at trial that the Court cannot deprive Dewey of a claim simply because Dewey allegedly acted badly (Trial Tr. 56:9-17), yet that is what Belcrest's post-trial submissions have asked me to do.  I hold there is no merit to the "unclean hands" contentions that Belcrest has made.

## V.    Dewey's Claim Is Overstated

Dewey's proof of claim includes three components: (a) the Rent and Additional Rent that had already come due and was unpaid at the time the bankruptcy petition was filed; (b) the damages attributable to the rejection of the Ground Lease (subject to the cap set forth in section 502(b)(6) of the Bankruptcy Code); and (c) costs awarded in the arbitration that Belcrest has not paid. Belcrest has disputed some of these items, and it has argued that it is entitled to offsets based on prior overpayments of taxes and utilities.

A.      **Accrued but Unpaid Prepetition Rent**

Dewey contends that $98,612.50 was due and owing but was unpaid at the time the

bankruptcy petition was filed, representing $93,916.67 of basic rent plus the 5% penalty

specified in the Ground Lease.  Belcrest does not dispute this figure.

B.      **Rejection Damages**

Dewey's damage claim based on the rejection of the Ground Lease is subject to section

502(b)(6) of the Bankruptcy Code, which provides that the claim of a lessor for damages

resulting from the termination of a lease of real property cannot exceed the amount due and

owing on the petition date plus "the rent reserved by such lease, without acceleration, for the

greater of one year, or 15 percent, not to exceed three years, of the remaining term of such

lease."  11 U.S.C. § 502(b)(6).  Although section 502(b)(6) refers to a "termination" of a lease

(rather than to a "rejection" of a lease), it is well-established that section 502(b)(6) applies as a

cap on rejection damages without regard to whether a lease has terminated for state law

purposes, and both parties agree that section 502(b)(6) acts as a cap on the Landlord's allowable

rejection damages claim.  *See Flanigan v. Samalex Trust (In re Flanigan)*, 374 B.R. 568, 577

(Bankr. W.D. Pa. 2007) (holding that section 502(b)(6) applies upon rejection of a lease even if

there is not a "termination" for state law purposes); *Broadfoot v. Jamestown Mgmt. Corp. (In re

Int'l. BioChemical Inds., Inc.)*, 521 B.R. 395, 402-3 (Bankr. N.D. Ga. 2014) (same); *In re Mr.

Gatti's*, 162 B.R. 1004 (Bankr. W.D. Tex. 1994) (holding that section 502(b)(6) deals with

claims against the estate and that the rejection of a lease terminates the estate's obligation to

perform under the lease, so that a rejection is a "termination" for purposes of section 502(b)(6)

even if it is not a "termination" for other legal purposes); 4 Collier on Bankruptcy ¶ 502.03[7][b]

("In effect, though, courts treat the rejection of a lease under section 365 as equivalent to a

termination by breach for purposes of capping a landlord's allowed damage claim under section 502(b)(6).").

The calculation of Dewey's allowed claim due to the rejection of the Ground Lease requires that I determine (a) the maximum amount of the Landlord's allowed claim under section 502(b)(6), (b) whether the Landlord's actual damages due to the rejection of the Ground Lease exceed the maximum allowable amount, and (c) whether Dewey properly may assert the entirety of the Landlord's allowed rejection damages claim.

### 1.    The Section 502(b)(6) Cap

The Ground Lease was not scheduled to expire until June 30, 2045 (24 years after the petition date and more than 23 years after the rejection date), so that the maximum time period for which rejection damages may be collected under section 502(b)(6) is three years.

The Ground Lease provides for the payment of "rent" and "Additional Rent." The parties agree that both amounts are "rent" for purposes of computing the maximum claim under section 502(b)(6). "Base" rent payments were equal to a percentage of the income that Belcrest derives from making parking available to its own tenants, subject to a minimum annual base rent payment of $690,000 per year. Dewey has calculated its claim on the assumption that the annual base rent would equal the contractual minimum ($690,000). The base rent payable for three years would have been $2,070,000.

"Additional Rent" was payable in the form of the taxes and public utility charges "made, assessed, levied, or imposed upon" the Leased Premises, which were to be paid "as the same become due and payable." Ground Lease, § 4.2(b). Portions of Garage A became part of the "Leased Premises" once the Transfer Date occurred. It is therefore appropriate to use the taxes and utilities payable with respect to Garage A in computing the maximum allowed rejection

damages claim that the Landlord may assert.  Belcrest's arguments that some of the future taxes might have come due after the Revenue Transfer Date, and might have been payable to New Town, is properly discussed in deciding how *much* of the Landlord's allowed damages claim is owned by Dewey, rather than in calculating the maximum amount of the Landlord's allowed rejection damages claim under section 502(b)(6).

Dewey's proof of claim is in evidence, and it attached materials that verify Dewey's projections for taxes and utilities in Garage A.  They show that over the relevant three years of the Ground Lease term the tenant would have been responsible for the payment of taxes in the amount of $483,490.09 and utilities in the amount of $48,629.64 with respect to Garage A.  Belcrest has not disputed those projections.

Dewey has not asked for payments of taxes and utilities with respect to the parking spaces that were to be made available in Garage B, even though some spaces in Garage B were designated as part of the Leased Premises.  Neither party offered any explanation for this omission, but the omission is favorable (not harmful) to Belcrest.

The sum of the base rent, taxes and utility charges that would have been payable as rent over the relevant three years of the remaining lease term is $2,602,119.73.  That amount represents the maximum rejection damage claim that may be allowed in favor of the Landlord pursuant to section 502(b)(6) of the Bankruptcy Code.

## 2.    The Landlord's Actual Damages

Section 502(b)(6) is a statutory "cap" on the allowable damage claim arising from the termination of a lease of real property.  The cap only applies if actual damages are higher than the capped amount.  If actual damages are lower, then the allowed claim from rejection of the lease is equal to the actual damages.

There was little evidence at trial, and little to no discussion in the parties' papers, about the actual damages (lost rents) that were caused by the rejection of the Ground Lease. There appears to be no dispute that the lost revenues would exceed the maximum amount allowed by section 502(b)(6). No dispute over this point was raised in Belcrest's objection to Dewey's proof of claim, ECF No. 159, or in the Joint Pretrial Order, or in Belcrest's contentions at trial.

Belcrest argued for the first time, in its post-trial submission, that the Landlord's actual damages claim should not be based on lost rents, but instead should be equal to the "Default Termination Payment" that the Ground Lease required if the tenant defaulted and if the Landlord served a notice of termination of the Ground Lease. Section 10.4 of the Ground Lease states:

> Upon such termination Tenant shall pay to Landlord a payment (the "Default Termination Payment") in an amount equal one hundred ten percent (110%) of an amount equal to (i) fifteen percent (15%) multiplied by (ii) the Net Annual Rent for the Lease Year most recently ending prior to the date of such termination multiplied by (iii) the number of full and fractional years from the date of such termination until June 30, 2035, increased by one and one-half percent (1.5%) per month for each month or portion thereof between the date of termination of the Ground Lease and the date upon which the Default Termination Payment is paid to Landlord.

This argument was raised for the first time in a post-trial submission filed on May 22, 2023. The issue was not raised in Belcrest's objection to Dewey's claim, or in the Joint Pretrial Order, or at trial.

The Default Termination Payment is part of the Ground Lease itself, and so Dewey certainly had notice of the existence of the provision. However, if the application of the provision depends on the underlying facts, and if Belcrest's delay deprived Dewey of a fair opportunity to offer evidence as to those facts, then the delay may have been unfairly prejudicial to Dewey. I therefore need to determine whether it is plain from the admitted facts that the provision is applicable, or whether the application of the provision depended on facts about which Dewey could have provided evidence if it had been given prior notice.

42

The key issue in deciding whether section 10.4 of the Ground Lease is applicable is whether the Ground Lease was "terminated" as that term is used in the Ground Lease. Section 10.4 contemplates a termination following a default by the tenant and the issuance of a termination notice by the Landlord. Here, Belcrest's rejection of the Ground Lease constituted a "breach" of the lease that is deemed to have occurred immediately prior to the bankruptcy filing. 11 U.S.C. § 365(g)(1). It is well-settled, though, that the rejection of a lease in bankruptcy does not "terminate" a lease for contract or other state law purposes. *See, e.g., Mission Prod. Holdings v. Tempnology*, *LLC*, 139 S.Ct. 1652, 1661 (2019) (holding that a rejection under section 365 constitutes a breach, not a rescission of a rejected contract or lease); *In re Old Carco LLC*, 406 BR 180, 199 (Bankr. S.D.N.Y. 2009) (citing 2 Norton Bankr. L. & Pract. 3d § 46:23 and holding that although rejection of a contract or unexpired lease constitutes a breach of contract, it does not terminate the contract or lease "except in the narrow situations set out in subsections (h) and (i) of § 365, which are not relevant here"); *In re Enron Corp.*, 01 B 16034 (AJG), 2006 WL 898033, at *4 (Bankr. S.D.N.Y. Mar. 24, 2006) (noting that except in certain limited circumstances, "rejection, although treated as a breach, does not terminate the lease or contract"). The parties, in their recent submissions on this issue, have each agreed that the rejection of the Ground Lease did not itself amount to a termination.

The Ground Lease provides that a "termination" occurs if the Landlord sends a notice of termination following a tenant's breach. However, there is no evidence that the Landlord issued a termination notice to Belcrest.

Belcrest contends that Dewey wrongly evicted Belcrest from the original parking location and wrongly forced Belcrest to use substitute parking to which Belcrest did not have enforceable legal rights, and that I should regard this conduct by Dewey as a "termination" of the Ground

Lease.  The arbitrator already held, however, that Dewey was entitled to designate Parking

Garages A and B as substitute parking and that Dewey did not breach the Ground Lease in doing

so.  As noted several times above, Belcrest's arguments that it was deprived of "legally

enforceable rights" to the substituted parking are belied by Belcrest's own admissions that the

Assignment Agreement gave Belcrest a leasehold interest in the substituted spaces.

Perhaps Belcrest thinks that other conduct occurred that might indicate that the Ground

Lease was "terminated" for purposes of section 10.4 of the Ground Lease.  The parties would

have had the opportunity to offer evidence on such points if Belcrest had raised the argument

before trial, or even during trial.  Belcrest did not do so.  It would be prejudicial to allow Belcrest

to make factual arguments about "termination" as to which Belcrest gave no fair notice before

trial.  I will therefore foreclose Belcrest from pursuing its belated arguments about the Default

Termination Payment.

### C.    What Portion of the Landlord's Claim Belongs to Dewey

Belcrest argues that Dewey should only be allowed to claim damages for rents lost prior

to the Revenue Transfer Date, on the theory that any later rents belong to New Town, which has

not filed a claim.

Under the Bankruptcy Code, the landlord's "claim" for lost rents as of the petition date

includes all future rents, regardless of whether those future rent claims were matured or

contingent.  11 U.S.C. § 101(5).  Courts have often referred to this feature of claims allowance as

an automatic acceleration of future obligations.  *HSBC Bank USA v. Calpine Corp.*, No. 07 Civ.

3088 (GBD), 2010 U.S. Dist. LEXIS 96792 at *10 (S.D.N.Y. Sept. 15, 2010) (holding that "the

filing of a bankruptcy petition renders all of a petitioner's outstanding debts mature and

payable"); *In re Manville Forest Prods. Corp.*, 43 B.R. 293, 297-98 (Bankr. S.D.N.Y. 1984)

("Bankruptcy operates as the acceleration of the principal amount of all claims against the debtor.") (internal citations omitted)).

The First Amendment to the Assignment Agreement states that Dewey retained all rights to rents that "accrued" prior to the Revenue Transfer Date. Belcrest rejected the Ground Lease, leaving a claim under the Bankruptcy Code that became allowable and therefore "accrued" as of the date of filing of the bankruptcy petition. 11 U.S.C. § 502.

In Belcrest's view, Dewey and New Town each had separate rights to future rents, and each therefore had a separate claim against Belcrest that was accelerated and that accrued at the time of the bankruptcy filing. In Dewey's view, the "Landlord" under the Ground Lease had a single claim against Belcrest, and that claim accrued as of the bankruptcy filing date. Since the bankruptcy filing date was before the Revenue Transfer Date, Dewey contends that Dewey owns the claim. Notably, there is no dispute between New Town and Dewey on this contractual point. New Town has confirmed that Dewey owns the entire claim and that New Town has no interest in it. New Town has represented the following:

> Reference is made to that certain Assignment and Assumption of Parking Lease between Dewey L.C. ("Dewey") and New Town Parking, LLC ("New Town"), as amended pursuant to that certain First Amendment to Assignment and Assumption of Parking Lease (the "Assignment").

> Reference is also made to that certain Proof of Claim filed by Dewey with the United States Bankruptcy Court for the Southern District of New York (Claim No. 5-3) (which amended Claim No. 5-2, which amended Claim No. 5-1), in the principal amount of $2,724,544.42 (the "Claim").

> We understand there is an action pending in the Court in which Debtor has objected to the allowance of the Claim. We further understand that at a conference held on April 4, 2023 the Court requested confirmation from New Town that Dewey is, and will continue to be the holder of the Claim.

> This confirms that in accordance with the Assignment, the claim is held by, and belongs to Dewey. This further confirms that New Town, on behalf of itself and any of its affiliates, does not claim an interest in, and expressly waives any future claim it may have with respect to, the Claim.

ECF No. 190.  Dewey and New Town are in agreement on this point.  Only Belcrest urges a

contrary interpretation, and Belcrest was not a party to the Assignment Agreement and played no

role in its negotiation or drafting.

Dewey and New Town are the best authorities as to the meaning of their own contract.

Dewey retained any rights the Landlord had to payments of rent and additional rent that accrued

before the Transfer Date, and Dewey and New Town agree that those rights included the claims

to damages under section 502(b)(6).  Their position is consistent with the language of the

Assignment Agreement and with the operation of the Bankruptcy Code.  Belcrest may wish that

the Assignment Agreement had stated otherwise, but Belcrest has no right to re-write other

parties' contracts in order to achieve a windfall for itself.  I therefore reject Belcrest's contention

and hold that Dewey is entitled to assert the full amount of the Landlord's allowed rejection

damages claim.

In light of this holding it is not necessary for me to rule on the alternative suggestion that

if New Town were deemed to own all or part of the claim then New Town should be allowed to

assert a late-filed claim on its own behalf.  I note, however, that even if Belcrest were correct I

would be inclined to permit New Town to file a claim, notwithstanding the fact that the bar date

has passed.  Belcrest has been on notice of the full Landlord claim at all times, and it would not

be prejudicial to Belcrest to allow a late-filed claim if one were needed.

*          *          *

Based on the foregoing, the portion of Dewey's allowed claim that represents rejection

damages is equal to the maximum permitted under section 502(b)(6), or $2,602,119.73.

### C.    Arbitration Expenses

The arbitrator ordered Belcrest to reimburse Dewey for $23,812.19 of expenses and arbitrators' fees that had been advanced by Dewey. This amount has properly been included in Dewey's claim and is not subject to the section 502(b)(6) cap.

### D.    Belcrest's Claimed Offsets

Belcrest contends that it is entitled to an offset of $384,155.53, representing amounts that Belcrest previously overpaid taxes. Belcrest contends that for many years prior to June 2021 Belcrest had been charged (and had paid) the taxes attributable to the entire 19.96 acre Dewey property of which the 7.9237 acre "Leased Premises" were only a part. At prior stages in this proceeding Dewey contended that Belcrest actually was using more than the 7.9237 acre "Leased Premises" and that it therefore was appropriate for Belcrest to pay the taxes and utilities attributable to the larger property. However, Dewey offered no evidence at trial of such use, or of any agreement by Belcrest to pay anything for the use of the larger property. Dewey insisted during the arbitration that the "Leased Premises" only encompassed the 7.9237 acre lot, and the arbitrator ruled in favor of Dewey on that point. Any amounts that Belcrest paid that were not attributable to the Leased Premises were excessive.

In its post-trial submissions Dewey does not deny that it charged Belcrest for the taxes and utilities attributable to the entire 19.96 acre property. Instead, Dewey contends that the evidence offered by Belcrest in support of its claimed offset was insufficient. I disagree. The parties stipulated that the exhibits (including Belcrest's Exhibit LL) were admissible in evidence. Furthermore, the ways in which prior tax and utility charges had been allocated was primarily in Dewey's own knowledge. Dewey had notice of Belcrest's calculations and had ample opportunity to present contrary evidence if it had any, but Dewey did not do so.

Belcrest has sought an offset for payments that it made for tax periods from and after November 15, 2015. Dewey contends that Belcrest's claimed offsets are subject to a three-year statute of limitations under Maryland law, a point which Belcrest has not disputed. Belcrest's exhibits do not state the dates on which payments were made. Dewey contends that the maximum offset for payments made during the limitations period would be $295,868.59. If I were to exclude all payments that *might* have been made before May 2018 (*i.e.*, those made with respect to tax years that include months prior to May 2018) then I would reach a lower figure than the one that Dewey has calculated. In the absence of contrary evidence by Belcrest I will accept the Dewey calculation of $295,868.59.

### E.     Dewey's Allowed Claim

Based on the foregoing, Dewey is entitled to an allowed claim of $2,428,675.83, representing the following:

| | | |
|---|---|---|
| Unpaid rent | $ | 98,612.50 |
| Rejection damages | $ | 2,602,119.73 |
| Arbitration expenses | $ | 23,812.19 |
| Offset | ($ | 295,868.59) |
| Net | $ | 2,428,675.83 |

Dated: New York, New York
      December 7, 2023

**s/Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge
